**Helen A. LYNCH, Plaintiff,**

v.

**CITY OF BOSTON, Kelley Cronin, Ann Maguire, and John Greeley, Defendants.**

No. CIV.A. 96–10162–REK.

United States District Court, D. Massachusetts.

Dec. 9, 1997.

**280**

Paul H. Merry, Garrity & Levin, Ellen J. Messing, Ellen Messino, Messing & Rudavsky, PC, Boston, MA, Stephen M. Voltz, Voltz & Nathan, Franklin, MA, Carolyn Koch, Washington, DC, for Helen A. Lynch, Plaintiff.

Kevin S. McDermott, City of Boston Law Department, Boston, MA, for City of Boston, Kelley Cronin, Ann Maguire, John Greeley, Defendants.

## Opinion

KEETON, District Judge.

## TABLE OF CONTENTS

I. PROCEDURAL BACKGROUND AND OUTCOME .....................................280
 A. THE COMPLAINT AND PRETRIAL PROCEEDINGS...........................280
 B. THE JURY TRIAL ....................................................281
 C. THE JUDGMENT ......................................................281
 D. POST-JUDGMENT MOTIONS .............................................281
 E. OUTCOME ...........................................................281
II. STRUCTURE OF THE OPINION ..............................................282
III. PENDING PROCEDURAL MOTIONS ...........................................282
IV. MUNICIPAL LIABILITY...................................................283
 A. PLAINTIFF'S CLAIMS OF JOINT AND SEVERAL LIABILITY .................283
 B. FOR WHOSE CONDUCT IS A MUNICIPALITY LIABLE?.......................284
V. QUALIFIED IMMUNITY ....................................................286
 A. QUALIFIED IMMUNITY AS A SHIELD FOR A PUBLIC OFFICIAL .............286
 B. A PREREQUISITE TO REACHING QUALIFIED IMMUNITY ...................286
VI. FIRST AMENDMENT CLAIMS................................................287
 A. INTRODUCTION ......................................................287
 B. BALANCING TESTS FOR FIRST AMENDMENT CLAIMS ......................287
 C. APPLYING A BALANCING TEST WHILE DECIDING WHETHER
 CONSTITUTIONAL RIGHTS ARE CLEARLY ESTABLISHED ................288
 D. EMPLOYEE STATUS AND ADVERSE EMPLOYMENT DECISIONS .............289
 E. MATTERS OF PUBLIC AND PRIVATE CONCERN ..........................290
 F. APPLYING QUALIFIED IMMUNITY TO FIRST AMENDMENT CLAIMS.......293
 1. MORE ABOUT PRECEDENTS ON BALANCING ......................293
 2. MOTIVATING FACTORS ......................................294
 3. AN ALTERNATIVE DETERMINATION FAVORING ALLOWANCE OF
 THE FIRST AMENDMENT CLAIM AGAINST DEFENDANT
 CRONIN.....................................................295
VII. CLAIMS OF HARM TO REPUTATION .........................................295
VIII. CLAIMS OF INTERFERENCE WITH ADVANTAGEOUS RELATIONSHIPS..........297
IX. CLAIMS FOR EMOTIONAL DISTRESS ........................................298
X. MORE ABOUT DEFENDANT CRONIN'S POST-JUDGMENT MOTIONS ..............300
 A. MOTION FOR NEW TRIAL ............................................300
 B. MOTION FOR JUDGMENT AS A MATTER OF LAW .........................300
 C. REMITTITUR .......................................................300
XI. ATTORNEY FEES AND COSTS ..............................................300
ORDER .....................................................................301

## I. Procedural Background and Outcome

### A. The Complaint and Pretrial Proceedings

Plaintiff Helen Lynch filed her complaint in state court (Middlesex Superior Court) on January 12, 1996. The defendants removed the case to federal court (Docket No. 1, filed January 29, 1996).

The five-count complaint in this case originally named the City of Boston, Kelley Cronin, Ann Maguire, and John Greeley as defendants.

By stipulation of dismissal (Docket No. 37, filed May 29, 1997), the parties agreed to the dismissal of John Greeley as a defendant.

## B. The Jury Trial

This civil action came before the court for a trial by jury as to all claims remaining after dismissal as to John Greeley. By rulings during trial, the court determined as a matter of law some issues bearing on claims and defenses, ordered that the case be submitted to the jury in two phases, and ordered that in each phase the verdict be in the form of answers to special questions under Rule 49(a) of the Federal Rules of Civil Procedure.

The jury returned a verdict answering in favor of the plaintiff questions bearing on Counts I and V and finding $24,000 in damages for harm to plaintiff's reputation because of the termination and nonrenewal of her relationship with the City of Boston, $12,000 in damages for injury to reputation because of her removal from the Mayor's Hunger Commission, $4,000 in emotional distress damages because defendant Cronin instructed plaintiff to "clear out her desk," and $10,000 in punitive damages for violating plaintiff's First Amendment rights.

## C. The Judgment

On October 16, 1997, the court entered Final Judgment (Docket No. 158) for the plaintiff against Kelley Cronin on Count I based on a First Amendment violation and on Count V based on intentional interference with an advantageous relationship.

The judgment was for the defendant Cronin on the verdict of the jury as to Counts II, III, and IV, for the defendant Ann Maguire, and for the defendant City of Boston.

## D. Post-Judgment Motions

Now before the court are:

(1) Defendant Kelley Cronin's Motion for Judgment as a Matter of Law or in the Alternative for a New Trial or Remittitur (Docket No. 159, filed October 27, 1997) and Memorandum in Support (Docket No. 160, filed October 27, 1997);

(2) Plaintiff's Motion to Alter or Amend Judgment Under Rule 59(e) with Rule 7.1 Certificate (Docket No. 161, filed October 27, 1997) and Plaintiff's Memorandum of Law in Support of Her Motion to Alter Amend Judgment (Docket No. 162, filed October 27, 1997);

(3) Plaintiff's Application for Attorney Fees and Costs (Docket No. 163, filed October 30, 1997) and Plaintiff's Memorandum in Support of Her Application for Attorney Fees and Costs (Docket No. 164, filed October 30, 1997);

(4) Response by Kelley Cronin in Opposition to Motion to Amend Judgment Order (Docket No. 169, filed October 31, 1997);

(5) Plaintiff's Motion to File Reply to Opposition to Plaintiff's Motion to Alter or Amend Judgment (Docket No. 172, filed November 11, 1997);

(6) Plaintiff's Emergency Motion for Leave to Supplement Opposition to Motion for Judgment as a Matter of Law or in the Alternative for a New Trial or Remittitur (Docket No. 173, filed November 11, 1997);

(7) Plaintiff's Supplemental Opposition to Defendant's Motion for Judgment as a Matter of Law or in the Alternative for a New Trial or Remittitur (Docket No. 174, filed November 12, 1997);

(8) Defendant Kelley Cronin's Opposition to Motion for Attorney Fees (Docket No. 175, filed November 13, 1997);

(9) Plaintiff's Motion to Add Addendum to Her Emergency Motion for Leave to Supplement Opposition (Docket No. 176, filed November 17, 1997); and

(10) Plaintiff's Assented–To Motion for Leave to File a Reply Brief in Support of Her Application for Attorneys' Fees and Costs (Docket No. 179, filed November 26, 1997).

## E. Outcome

For the reasons explained in this opinion, defendant Kelley Cronin's motion for judgment notwithstanding the verdict is sustained in part, on grounds of qualified immunity, and that part of the judgment against her on the First Amendment claim, including punitive as well as compensatory damages, is

vacated. Having made these rulings, the court orders entry of an amended judgment in favor of defendant Cronin on Count I. The amended judgment still includes the award for plaintiff against defendant Cronin on Count V (for intentional interference with plaintiff's advantageous relationship). Plaintiff's motion for attorney fees is denied. In all other respects the motions for modification of the judgment are denied.

## II. Structure of the Opinion

This opinion addresses procedural motions in Part III. In other Parts, it addresses substantive issues in sequence.

Part IV addresses key issues of municipal liability. Part V concerns application of the law of qualified immunity to plaintiff's claims against individual defendants. Part VI addresses whether qualified immunity bars recovery for a First Amendment violation. Part VII addresses whether qualified immunity bars recovery for harm to reputation. Part VIII addresses defendant's challenge to the judgment entered for plaintiff on Count V (intentional interference with an advantageous relationship). Part IX addresses plaintiff's request to make the finding of intentional interference with an advantageous relationship a basis for the emotional distress award of damages. Part X addresses defendant Cronin's remaining arguments for judgment as a matter of law, a new trial, and remittitur. Part XI addresses plaintiff's motion for attorney fees.

## III. Pending Procedural Motions

Plaintiff filed a Motion for Leave to File Reply to Opposition to Motion to Alter or Amend Judgment (Docket No. 172, filed November 11, 1997). This motion is ALLOWED, but only to the extent and subject to the conditions explained here.

Plaintiff filed an Assented–To Motion for Leave to File a Reply Brief in Support of Her Application for Attorneys' Fees and Costs (Docket No. 179, filed November 26, 1997). This motion is ALLOWED, but only to the extent and subject to the conditions explained here.

The parties filed a Joint Motion to Extend Time to Reply (Docket No. 170) seeking to extend to December 10, 1997, the date by which the plaintiff had to respond to Motion by Kelley Cronin for Judgment as a Matter of Law or in the Alternative for a New Trial or Remittitur, and by which the defendant had to respond to Motion by Helen A. Lynch for Attorney Fees. By a Memorandum & Order issued on November 10, 1997 (Docket No. 171), the court denied this motion.

The plaintiff filed her Opposition to Motion by Kelley Cronin for Judgment as a Matter of Law or in the Alternative for a New Trial or Remittitur (Docket No. 180, filed November 11, 1997). In addition, the plaintiff filed an Emergency Motion for Leave to Supplement Opposition to Motion for Judgment as a Matter of Law (Docket No. 173, filed November 11, 1997), and filed a Motion to Add Addendum to Her Emergency Motion for Leave to Supplement Opposition (Docket No. 176, filed November 17, 1997).

■ To the extent that a trial court has authority to extend deadlines for post-judgment motions, including reply deadlines, I conclude that the authority is for discretionary extensions rather than extensions that are mandatory on request. In denying the Joint Motion to Extend Filing Deadlines, the court found that "[t]he parties had ample opportunity for research and investigation before trial and have not shown any good cause for being allowed to raise new issues after trial and verdict." *See* Memorandum & Order of November 10, 1997 (Docket No. 171).

■ Plaintiff's counsel has argued that the court misled counsel to believe the court would allow an extension of time for replies. The record of the conference in which plaintiff's counsel asserts the court misled her, however, shows clearly that the court called attention to its concern about authority to allow new issues to be raised after trial, and the possibility that a purported extension of time for that purpose might be treated on appeal as unauthorized. Transcript, Conference of October 15, 1997, pages 9–13. The court's promise was,

Now, once you've filed whatever motions you wish to file, both of you, I will do my best to be reasonable, but only reasonable and not generous, in allowing time for whatever submissions in support of an opposition in the way of memoranda of authorities or whatever.

*Id.* at 11. This promise did not extend to authorizing any party to raise new issues long after all issues relevant to the outcome should have been raised, even before trial commenced. Timely disclosure of contentions in advance of trial is needed in order to provide fair opportunity to an opposing party to prepare before trial to respond and not be confronted for the first time after trial with new contentions or new grounds for contentions previously stated with such generality that no reasonable notice had been given that they would be made. In view of these circumstances, and in the interests of fair protection against untimely assertions of new contentions, plaintiff's motions to file supplemental oppositions (Docket Nos. 173 and 176) are allowed only to the extent and on the conditions explained in this paragraph. I have considered these filings solely to assure myself that they do not present a contention that, if rejected, would result in a fundamental miscarriage of justice. *See* Fed.R.Civ.P. 15(a) (leave to amend granted when "justice so requires").

■■■ A trial court does have discretion in many circumstances to allow departures from ordinary procedure to avoid a miscarriage of justice. *See, e.g., Johnston v. Holiday Inns, Inc.,* 595 F.2d 890, 894 (1st Cir. 1979) (recognizing the possibility of circumstances "so compelling as virtually to insure success of the contention," or arguments so compelling that they "must be ruled upon to avoid a miscarriage of justice"); *see also United States v. Roberts,* 119 F.3d 1006, 1014 (1st Cir.1997) (recognizing First Circuit law on preclusion that bars errors not objected to at trial unless fundamental fairness would be undermined); *Scarfo v. Cabletron Sys., Inc.,* 54 F.3d 931, 941 (1st Cir.1995) (noting that the plain evidence rule should be applied only to prevent a clear miscarriage of justice); *Aetna Casualty Surety Co. v. P & B Autobody,* 43 F.3d 1546, 1571 (1st Cir.1994) (concluding no miscarriage of justice oc-

curred as a result of harmless errors); *Davet v. Maccarone,* 973 F.2d 22, 29 (1st Cir.1992), discussed in Part X below. A court must take into account also, however, that "[a] vigorously enforced timeliness principle is fundamental both to fair process and to avoiding adverse effect on substantial rights of the parties." *Scarfo,* 54 F.3d at 940.

Having considered all the submissions tendered for filing, I have concluded that they are in substance no more than reformulations of arguments previously made and do not call attention to any issue material to the outcome and not previously considered. Moreover, as was true of the earlier Joint Motion to Extend Filing Deadlines (Docket No. 170) and the Emergency Motion for Leave to Supplement Opposition (Docket No. 173), "[t]he parties had ample opportunity for research and investigation before trial and have not shown any good cause for being allowed to raise new issues after trial and verdict." Memorandum & Order of November 11, 1997 (Docket No. 171).

## IV. Municipal Liability

### A. Plaintiff's Claims of Joint and Several Liability

■■■ Plaintiff requests that the court alter judgment and hold the City of Boston jointly and severally liable, along with defendant Cronin, for the compensatory damages awarded under Count I (the First Amendment violation). The label "joint and several" liability, standing alone, might be interpreted as suggesting that the City should be held liable on the ground that "joint and several" liability is a theory developed in the *common law and the law of Massachusetts,* independent from other theories of liability in tort, and that the court should hold the City of Boston liable under this theory, regardless of whether or not this or higher courts determine that individual defendants are not liable. Under such a theory, for example, liability might be imposed on the City by extending the label "joint" to apply in some circumstances, even though only one person (or entity, such as a corporation or municipality) is liable. *See generally* Restatement (Third) of Torts §§ 20, 24, 27, 28,

50–52 (Council Draft No. 2, November 13, 1997). Any contention that the law of Massachusetts recognizes an independent theory of "joint and several" liability, if made, should be rejected. But plaintiff's submissions, closely read, do not appear to be using the label "joint" for any reason other than to reinforce the point that plaintiff continues to assert liability of defendant Cronin individually and argue that the City is jointly liable with any employee who acted on behalf of the City.

Moreover, rejection of the independent theory and the label associated with it does not preclude the possibility that the City alone may be held liable ("solely" rather than "jointly") in circumstances in which all the elements of joint and several liability of the City and one of its employees or independent contractors existed but for the applicability of qualified immunity to protect the employee or independent contractor. See Restatement (Second) of Torts § 880 (1977). For this reason, potential grounds of municipal liability in this case must be examined in more detail. Part IV.B, below, and later Parts of this opinion consider potential grounds of liability of the City both in the event that qualified immunity protects the individual defendants and in the event that it does not.

**B. For Whose Conduct Is a Municipality Liable?**

■ Because defendant Cronin was the final decisionmaker with respect to employment decisions on behalf of the City for the Emergency Shelter Commission, plaintiff contends that Cronin necessarily was acting on behalf of the City in matters as to which the court ordered judgment on the verdict of the jury against Cronin (Cronin's acting in retaliation against Lynch because of Lynch's telephone call of January 12, 1994).

Plaintiff notes in her memorandum in support of her motion that if a "municipal decisionmaker possesses final authority to establish municipal policy with respect to the action ordered," municipal liability may be found. Pembaur v. City of Cincinnati, 475 U.S. 469, 481, 106 S.Ct. 1292, 1299, 89 L.Ed.2d 452 (1986).

Plaintiff's argument fails, however, to respond adequately to well settled qualifications of the scope of municipal liability. The Supreme Court of the United States has "consistently refused to hold municipalities liable under a theory of respondeat superior" as that concept is ordinarily understood and applied in tort law generally, and in the law of constitutional torts particularly. Board of County Comm'rs v. Brown, — U.S. —, —, 117 S.Ct. 1382, 1388, 137 L.Ed.2d 626 (1997); see also Monell v. Dept. of Social Servs., City of New York, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978).

■ In order to hold a municipality liable under a 42 U.S.C. § 1983 claim, the plaintiff must identify a municipal policy or custom that caused the plaintiff's injury. See Monell, 436 U.S. at 694, 98 S.Ct. at 2037.

■ It is true, as plaintiff contends, that the law has been clear since Pembaur that a single act by a municipal policymaker may give rise to a municipal policy. Pembaur, 475 U.S. at 480, 106 S.Ct. at 1298 But plaintiff's heavy reliance on Pembaur, like that of the plaintiff in Brown, "blurs the distinction between cases that present no difficult questions of fault and causation and those that do." Brown, — U.S. at —, 117 S.Ct. at 1389. The present case does involve difficult questions of fault and causation with respect to some of the plaintiff's claims, and it also involves additional difficulties that bear upon the elements of a prima facie showing of legal responsibility of both the municipality and the individual municipal officials, Kelley Cronin and others, and upon the qualified immunity that may be invoked by the individually sued officials.

■ One settled proposition is that a mere showing of discretion to make a decision (such as a hiring or firing decision), is not necessarily sufficient to constitute a showing of a "final government policy" that supports municipal liability. See Pembaur, 475 U.S. at 483 n. 12, 106 S.Ct. at 1299 n. 12.

The Supreme Court did not veer from this line of analysis in its most recent opinion on the topic. The Court stated that merely

showing conduct attributable to the municipality is not enough; rather the

plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the moving force behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.

*Brown*, —— U.S. at ——, 117 S.Ct. at 1388.

The opinion of the Court in *Brown* observes: "Where a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into respondeat superior liability." *Id.* —— U.S. at ——, 117 S.Ct. at 1394. In the present case, the problem with plaintiff's argument (especially on the First Amendment claim) is not that it collapses municipal liability into classic respondeat superior liability (as in *Brown*), but that it would expand municipal liability beyond the liability of private employers by making the municipality liable for intentional torts for which the private employer would not be liable because the employee had stepped outside the scope of employment to wreak private vengeance and retaliation.

Indeed, citing *Pembaur*, plaintiff argues that a municipality's "vicarious" liability is more expansive than "respondeat superior" liability, public or private. Plaintiff's Reply to Defendant's Motion to Alter or Amend Judgment at p. 2 (attached to Docket No. 172).

To support liability of the scope plaintiff claims here, the court would have to conclude that the municipality's granting authority to a department head to hire, fire, supervise, and discipline employees and independent contractors to do work within that designated department is authority to set a policy of retaliation against free speech within that department.

Even Justice Souter's dissent in *Brown*, interpreting precedent to further municipal liability to an extent contrary to the opinion of the Court, and Justice Breyer's dissent in *Brown* (joined by Justices Stevens and Ginsburg), suggesting a basic reexamination and reconsideration of municipal liability, would reach this case only if the interpretations of present doctrine or the refashioned doctrine made municipalities liable more broadly to include liability for more of the intentional torts of employees and independent contractors than private enterprise bears under present law. In some circumstances, it is true, statutory mandates support liability "to the same extent" as a private individual. *See, e.g.,* Mass. Gen. L. ch. 258, § 2 ("Public employers shall be liable ... to the same extent as a private individual under the same circumstances"); *see also Meyers v. Grubaugh*, 242 Kan. 716, 750 P.2d 1031, 1037 (1988) (finding no duty imposed on state where no duty would be imposed on private employer). But ordinarily the law does not impose on a governmental entity broader liability for more of the intentional torts of employees and independent contractors than private enterprise bears under present law. As illustrated in the Restatement of Agency, and in numerous cases citing it, a private enterprise has liability of substantially less scope for harm caused intentionally than for harm caused negligently or otherwise accidentally. *See* Restatement (Second) of Agency § 228 (1965) (master not subject to liability for torts of servants acting outside scope of employment); *Id.* at § 245 cmt. f (servant acting in outrageous manner or inflicting disproportionate punishment indicates action outside the scope of employment).

Here, the jury found that defendant Cronin had the final authority to make hiring and firing decisions on behalf of the City. *See* Phase One Verdict Form, Part I, Question 6. Also, the evidence adduced at trial indicated that defendant Cronin's personnel decisions were not subject to review. Defendant Cronin was a final municipal decisionmaker within the scope of this delegated authority. It does not follow, however, that her authority extended to establishing a special policy for her department, different from that of other departments and from that of the City government as a whole, regarding free speech. This point applies both to issues regarding the elements of a showing of a prima facie basis of liability, discussed in Part VI below,

and to the issue of qualified immunity, discussed in Part V below.

## V. Qualified Immunity

### A. Qualified Immunity as a Shield for a Public Official

■ Qualified immunity is not a "defense" in the ordinary sense, but an immunity from suit. *See Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985). Qualified immunity shields a public official from tort liability for an administrative act if she is engaged in the exercise of a discretionary function, or she is privileged and does not exceed or abuse the privilege. *See* Restatement (Second) of Torts § 895D(3) (1977). Government officers performing discretionary functions are protected from liability in order to "preserve independence of action without deterrence or intimidation by the fear of personal liability and vexatious suits." *Id.* at § 895D cmt. a. Qualified immunity is broad in that it "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986).

■ Hiring and firing are discretionary functions. *See Davis v. Scherer,* 468 U.S. 183, 196–97 n. 14, 104 S.Ct. 3012, 3020–21, 82 L.Ed.2d 139 (1983). In the absence of a precise specification of the action that a government official must take, the official ordinarily has discretionary authority. *Id.* Allocation of office space is among the kinds of everyday decisions an administrator must make for which decision rules are not precisely specified.

■ I conclude that Kelley Cronin's decisions to move the plaintiff's work area, to reorganize the Can Share position, to hire Mr. Markland for the new position, and not to rehire plaintiff Helen Lynch to coordinate the 1994 Can Share program were within Kelley Cronin's discretionary functions as Director of the Emergency Shelter Commission. Standing alone, these discretionary decisions by Kelley Cronin would be immune from suit. The plaintiff is not entitled to damages just because her desk was moved,

or her position was changed in a reorganization, or her services were no longer needed.

■ Qualified immunity is not an absolute. Government officials performing discretionary functions are protected from civil damages only so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1981). A defense of qualified immunity ordinarily fails where the law that was violated was clearly established, "since a reasonably competent public official should know the law governing his conduct." *Harlow,* 457 U.S. at 819, 102 S.Ct. at 2738. *Harlow* modified to some extent the earlier declaration of the Court, in *Wood v. Strickland,* that an official is not immune if he or she **"knew** or should have known" that the action taken would violate constitutional rights. 420 U.S. 308, 321, 95 S.Ct. 992, 1000, 43 L.Ed.2d 214 (1974) (emphasis added). Under the law of qualified immunity as it now stands, an objective standard concerned with what a reasonable official would have known applies, and the standard is more precisely focused on the particular conduct at issue than one might have inferred from *Wood v. Strickland.* Thus, for a plaintiff to recover damages against the official who asserts qualified immunity, the right allegedly violated must be "sufficiently clear that a reasonable official would understand that what he's doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1986).

If the plaintiff can demonstrate that Kelley Cronin's conduct violated her clearly established constitutional rights, and that an ordinarily prudent official in Kelley Cronin's position would have known that what she was doing was a violation of plaintiff's rights, plaintiff can overcome Kelley Cronin's qualified immunity.

### B. A Prerequisite to Reaching Qualified Immunity

■ A debatable issue regarding qualified immunity need not be reached, however, in the adjudication of a claim brought

under 42 U.S.C. § 1983, unless plaintiff shows conduct and injury of a significance that measures up to or above the threshold of violation of some provision of the Constitution and laws of the United States. *See Siegert v. Gilley,* 500 U.S. 226, 232, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991) (citing *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738). In other words, "before even reaching qualified immunity, a court ... must ascertain whether the [plaintiff has] asserted the violation of a constitutional right at all." *Watterson v. Page,* 987 F.2d 1, 7 (1st Cir.1993).

Issues bearing on whether the plaintiff has satisfied this requirement as to each of her claims are discussed in Parts VI–VII, below.

## VI. First Amendment Claims

### A. Introduction

■■■ A government entity may not discharge an employee for that employee's exercise of rights of speech protected by the First Amendment. *See Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972). Even a person who ordinarily may be discharged for any reason whatsoever (that is, an employee at-will) may have a claim against a government entity that decides not to rehire based on the exercise of that person's constitutionally protected First Amendment rights. *See Mt. Healthy v. Doyle,* 429 U.S. 274, 283, 97 S.Ct. 568, 573, 50 L.Ed.2d 471 (1976).

This general proposition about protected speech in employment relationships is well established. The Supreme Court has said, for example, that "[i]t is now clearly established that a State may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech." *Rankin v. McPherson,* 483 U.S. 378, 383, 107 S.Ct. 2891, 2896, 97 L.Ed.2d 315 (1987); *see also Perry,* 408 U.S. at 597, 92 S.Ct. at 2697.

■■■ Often, however, a court must consider complex subsidiary rules to determine whether the general proposition applies to a particular case before the court. In the present case, defendant Cronin argues that Ms. Lynch does not qualify for First Amendment protections because: (1) she was not an employee at the time of the telephone call; (2) her call was not based on matters of public concern; (3) the City's interest in efficiency outweighs the plaintiff's interest; and (4) the plaintiff's telephone call was not "**the** motivating factor" (emphasis added) behind defendant Cronin's actions. *See* Defendant Kelley Cronin's Memorandum of Law in Support of Her Motion for Judgment as a Matter of Law After Trial or in the Alternative for a New Trial or Remittitur at pp. 3–9 (Docket No. 160).

The Court of Appeals for the First Circuit has articulated a three-part test for determining whether a plaintiff has presented an actionable claim for the infringement of a public employee's First Amendment rights. *See O'Connor v. Steeves,* 994 F.2d 905, 912 (1st Cir.1993). Neither in the *O'Connor* opinion nor in any other opinion to date, however, has the Court of Appeals for the First Circuit explicitly decided whether this framework for decision must be modified when speech of an independent contractor, rather than an employee in the ordinary sense, is involved. Nevertheless, a factor in the decision to submit this case to the jury on special questions only under Rule 49(a) of the Federal Rules of Civil Procedure was the likelihood that an *O'Connor* test, or one closely analogous to it, would be applied in this context and would require consideration of disputed historical facts as well as evaluative questions. The historical and evaluative questions that are potentially relevant to the ultimate determination of the merits of plaintiff's First Amendment claims of municipal and individual liability are complex. The inquiry begins here, with the role of balancing tests in the First Amendment context.

### B. Balancing Tests for First Amendment Claims

■■■ One of the questions potentially material to claims of municipal liability for speech in the employment context is whether the plaintiff's speech was an expression of the speaker in the role of citizen on matters of public concern, or instead an expression in the role of employee (or independent contractor) on matters of only personal interest (or perhaps some combination of the two). *See*

*O'Connor,* 994 F.2d at 912 (quoting *Connick v. Myers,* 461 U.S. 138, 147–48, 103 S.Ct. 1684, 1690–91, 75 L.Ed.2d 708 (1983)). Many precedents support the use of what is commonly called a "balancing" test in this context. If the speech was on a matter of public concern,

> the court must balance the strength of the employee's First Amendment interest, and any parallel public interest in the information which the employee sought to impart, against the strength of the countervailing governmental interest in promoting efficient performance of the public service
> . . . .

*Id.* (citing *Pickering* ).

## C. Applying a Balancing Test While Deciding Whether Constitutional Rights Are Clearly Established

Many of the Courts of Appeals of the Circuits, including the First Circuit, have approved the use of a balancing test for deciding a wide variety of claims of municipal liability to employees, recognizing that because an employee's

> interest must always be balanced against the governmental interest involved, it is difficult if not impossible, for officials to know when they have violated "clearly established" law.

*Frazier v. Bailey,* 957 F.2d 920, 931 (1st Cir.1992) (addressing generalized right to "familial integrity"). The definition of federal constitutional and statutory rights as refined by use of a balancing test may fall short of being clearly established because public officials would have difficulty in ascertaining when those rights are infringed. *Id.* (citations omitted).

As suggested in the foregoing discussion of *Frazier,* I conclude that the Court of Appeals for the First Circuit has not explicitly decided whether a First Amendment right is to be evaluated under a balancing test, with a consequence, among others, of impeding a plaintiff's effort to show that an ordinarily prudent official would have known that what plaintiff claims was done was in violation of a clearly established right. Other Circuits have ruled on the matter, however, and the overwhelming majority have determined that

when a balancing test is to be applied, the right is not clearly established. *See, e.g., Bartlett v. Fisher,* 972 F.2d 911, 917 (8th Cir.1992) (First Amendment rights not "clearly established" for the purposes of qualified immunity because "the defendants placed the *Pickering* balancing test squarely at issue"); *Guercio v. Brody,* 911 F.2d 1179, 1188 (6th Cir.1990) (qualified immunity appropriate because reasonable persons in the defendant-judge's position as employer could have disagreed on the outcome of balancing), *cert. denied,* 500 U.S. 904, 111 S.Ct. 1681, 114 L.Ed.2d 76 (1991); *Melton v. Oklahoma City,* 879 F.2d 706, 729 (10th Cir.1989) (deciding that fact-specific inquiry precludes the determination of a clearly established right), *vacated on other grounds,* 928 F.2d 920 (10th Cir.1991); *Dartland v. Metropolitan Dade County,* 866 F.2d 1321, 1324 (11th Cir.1989) (deciding that the only relevant consideration is whether a reasonable official would necessarily know that the termination of the employee violated constitutional rights); *Noyola v. Texas Dept. of Human Resources,* 846 F.2d 1021, 1025 (5th Cir.1988) ("There will rarely be a basis for *a priori* judgment that the termination or discipline of a public employee violated 'clearly established' constitutional rights"); *Rakovich v. Wade,* 850 F.2d 1180, 1213 (7th Cir.1988) (deciding it was not clearly established that defendants' actions violated constitutional rights), *cert. denied,* 488 U.S. 968, 109 S.Ct. 497, 102 L.Ed.2d 534 (1988).

Where a balancing of competing interests is required, the analysis "is so fact dependent that the law can rarely be considered clearly established." *Benson v. Allphin,* 786 F.2d 268, 276 (7th Cir.1986) (internal quotations omitted), *cert. denied,* 479 U.S. 848, 107 S.Ct. 172, 93 L.Ed.2d 109 (1986). The reason for this rule is that where a balancing test is required, reasonable public officials cannot be expected to know what the outcome of application of the test will be, and therefore cannot be expected to know that what is being done will be a violation of a "clearly established" right.

This does not necessarily mean, however, that only binding precedent directly on point produces a "clearly established" right. *See*

*Rakovich,* 850 F.2d at 1209. Rather, cogently analogous cases may be sufficient to establish a right. The relevant question is whether a reasonable official in the defendant's position would be expected to know that adverse action toward the plaintiff under the circumstances would violate the plaintiff's constitutional rights. *See Dartland,* 866 F.2d at 1324.

It is also true, on the other hand, that the applicability of a balancing test to a particular case inevitably lends weight to whatever other support exists for a determination in favor of qualified immunity in that case.

> Because no bright-line standard puts the reasonable public employer on notice of a constitutional violation, the employer is entitled to immunity except in the extraordinary case where *Pickering* balancing would lead to the inevitable conclusion that the discharge of the employee was unlawful.

*Id.* at 1234. Thus the question here is whether the balancing test would lead to the inevitable conclusion that defendant Cronin's actions were unlawful.

In some Circuits, this approach to qualified immunity in the First Amendment context has been explicitly rejected because of its tendency to lead courts to the conclusion of qualified immunity whenever a balancing test is applied. As one court stated, "We decline to adopt a rule that would effectively eviscerate whistleblower protection for public employees." *Roth v. Veteran's Admin.,* 856 F.2d 1401, 1408 (9th Cir.1988) (distinguishing *Benson* which considered *Pickering* balancing after a full trial rather than on a motion for summary judgment).

The Court of Appeals for the Eighth Circuit declared First Amendment rights clearly established in the retaliatory discharge context based on the language in *Rankin.* *See Casey v. City of Cabool,* 12 F.3d 799, 803 (8th Cir.1993), *cert. denied,* 513 U.S. 932, 115 S.Ct. 325, 130 L.Ed.2d 285 (1994). But, in *Casey* the court did not fully examine the effect of an analysis under the balancing test for public officials forced to make determinations as to whether a right is clearly established.

At the time that defendant Cronin told plaintiff to clear out her desk in January, 1994 (and now), the only decisions of the First Circuit, available to guide district courts in this Circuit, support the outcome of qualified immunity where the finding of a constitutional right depends upon a balancing test. *See, e.g., O'Connor,* 994 F.2d at 917 n. 11; *Frazier,* 957 F.2d at 931.

In the present case, the jury found that defendant Cronin had "reason to believe that retaliation against employees who 'blow the whistle' ... would, more likely than not, be illegal." Phase One Verdict Form, Part I, Question 4(a).

The plaintiff, however, was not an employee, on January 13, 1994. *See* Phase One Verdict Form, Part I, Question 3. And although the Supreme Court has extended First Amendment protection to independent government contractors facing retaliatory nonrenewal, *see Board of County Comm'rs v. Umbehr,* 518 U.S. 668, ——, 116 S.Ct. 2342, 2346, 135 L.Ed.2d 843 (1996), this extension came two years after Cronin's retaliatory action.

Courts cannot expect government officials to predict the law, especially not on issues so complex and divisive that the Supreme Court must be called upon to rule. At the time defendant Cronin told plaintiff to clear out her desk, a reasonable official in her position would not have known the outcome of an adjudicator's application of a balancing test. For this reason, a reasonable official would not have been able to know that telling Helen Lynch to clear out her desk was a violation of a clearly established right.

At the time defendant Cronin decided on nonrenewal of Helen Lynch's contractual relationship with the City, a reasonable official would not have been able to know that the nonrenewal was a violation of a clearly established right.

## D. Employee Status and Adverse Employment Decisions

The jury found that as of January 12, 1994, the day Helen Lynch placed the telephone call, she was not a current employee of the City of Boston, but instead, that she was a

former employee under one of a succession of temporary contracts for part-time employment during part of the year. *See* Phase One Verdict Form, Part I, Question 3(a)-(c). The defendant argues that the plaintiff could not have First Amendment protection as an employee because she could not have been discharged, as she was not an employee. This argument fails in two respects: the plaintiff need not be a current employee to receive First Amendment protection, and adverse employment decisions other than discharge may be actionable.

Although plaintiff Lynch was not an employee at the time she was instructed to clear out her desk, she is protected as an independent contractor. The First Amendment analysis that has in the past been applied to persons engaged by the government to perform some services has been extended recently to apply to persons engaged as independent contractors. *See O'Hare Truck Serv., Inc. v. City of Northlake,* 518 U.S. 712, 116 S.Ct. 2353, 135 L.Ed.2d 874 (1996) (protecting independent contractor from retaliation for refusal to offer support to a political campaign); *Board of County Comm'rs v. Umbehr,* 518 U.S. 668, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996) (protecting independent contractor from retaliation for speech critical of county government).

Furthermore, discharge is not, as the defendant would have it, an accurate description of the adverse employment action challenged in this case. Rather, an adverse employment action, or decision, in a broader sense, including the failure to rehire, is what the court must examine. For example, in *Mt. Healthy,* a teacher was not discharged for his views, but the Board of Education's failure to rehire him was actionable. 429 U.S. at 283, 97 S.Ct. at 573. Similarly, in *Perry,* the Supreme Court noted that lack of a contractual right to continued employment (in that case, tenure) did not defeat the plaintiff's First Amendment claim. 408 U.S. at 596, 92 S.Ct. at 2696. If any doubt remained previously, in 1996 the Supreme Court resolved the doubt by making it clear that an independent contractor is protected from *retaliatory nonrenewal* of its contract for expressing political views. *See Umbehr,* 518 U.S. at ——, 116 S.Ct. at 2346.

The defendant further argues that no adverse employment decision was made in retaliation since "the Jury found that the Plaintiff was not qualified for the new Staff Assistant II position, which was the only position available" because the Can Share coordinator position had been incorporated into the new Staff Assistant II position. Defendant Kelley Cronin's Memorandum of Law in Support of Her Motion for Judgment as a Matter of Law After Trial or in the Alternative for a New Trial or Remittitur at pp. 3,6 (Docket No. 160).

True, it is undisputed that the Jury found that the plaintiff was unqualified for the new Staff Assistant II position. *See* Phase One Verdict Form, Part II, Question 4(c)(2)(B). Furthermore, the jury found that defendant Cronin's hiring of Mr. Markland for the new position was not done in retaliation against plaintiff for plaintiff's telephone call. *See id.* at Part II, Question 5(a)(2)(A).

The violation of plaintiff Lynch's rights had occurred earlier, on January 13, 1994, when defendant Cronin told plaintiff to clear out her desk. At that time, the Emergency Shelter Commission had not yet been reorganized. At that time, a possibility still existed that the City of Boston would contract with the plaintiff for the 1994 Can Share season. The fact that the defendants chose to reorganize and redefine a job position after January 13, 1994 cannot have the retroactive effect of shielding the defendant from liability for a violation that had already occurred. Thus, it is irrelevant that Helen Lynch was not qualified for a position created after the violation, nor is it relevant that another, more qualified individual was hired for the new position.

## E. Matters of Public and Private Concern

Not all speech by government employees and contractors is protected. Rather, in order to be protected, the speech must be on a matter of public concern. *See Connick,* 461 U.S. at 146, 103 S.Ct. at 1689. Courts have established two different approaches to determining whether speech is on a matter of public concern. One approach is an objective

content-based analysis that provides protection for speech that, as evaluated by an authorized adjudicator, is on a topic of public concern, such as charges of official malfeasance or abuse of office. *See Koch v. City of Hutchinson,* 847 F.2d 1436, 1446 n. 17 (10th Cir.) (*en banc*), *cert. denied,* 488 U.S. 909, 109 S.Ct. 262, 102 L.Ed.2d 250 (1988). The second approach is subjective in the sense that the adjudicator determines the plaintiff's motivation, leaving speech made purely for private interests unprotected, even if it touches on a matter of public concern. *See Terrell v. University of Texas Sys. Police,* 792 F.2d 1360, 1362 (5th Cir.1986), *cert. denied,* 479 U.S. 1064, 107 S.Ct. 948, 93 L.Ed.2d 997 (1987).

The Court of Appeals for the First Circuit has adopted a tiered approach that first asks whether the speech was on a matter of "inherent" public concern. *See O'Connor,* 994 F.2d at 913. If the speech is not on a matter of "inherent" public concern, a further inquiry into the plaintiff's motives is necessary. *Id.* Under this tiered approach, motive alone is not dispositive; if it were, there would be no need to consider whether the speech was on a matter of public concern. *Id.* at 914 n. 5 (*quoting Zamboni v. Stamler,* 847 F.2d 73, 78 (3d Cir.), *cert. denied,* 488 U.S. 899, 109 S.Ct. 245, 102 L.Ed.2d 233 (1988)).

The Supreme Court has observed that whether speech addresses a matter of public concern must be determined by the "content, form, and context of a given statement, as revealed by the whole record." *See Connick,* 461 U.S. at 147–48, 103 S.Ct. at 1689. No precise definition of "matters of inherent public concern" has been formulated, yet other cases can be instructive. *See, e.g., O'Connor,* 994 F.2d at 916 (public statements by superintendent of Public Works about town selectmen's improper use of department monies was a matter of inherent public concern); *Brasslett v. Cota,* 761 F.2d 827, 844 n .14 (1st Cir.1985) (a fire chief's public statements about a Town Council's actions in regard to fire protection was considered a matter of inherent public concern). In *O'Connor,* the Court of Appeals for the First Circuit considered it relevant that the speech was not limited to "internal personnel procedures, affecting only [the plaintiff] and other department employees." *O'Connor,* 994 F.2d at 915. "Rather [the plaintiff's] revelations directly implicated a topic of inherent concern to the community—official misconduct by an incumbent elected official." *Id.*

As to matters that are not of "inherent" public concern, the Court of Appeals for the First Circuit instructs a district court to conduct a thorough examination of the form and context of the expression

> with a view to whether the community *in fact* manifested a legitimate concern in the internal workings of the particular agency or department of government, and if so, whether the "form" of the employee's expression suggests a subjective intent to contribute to any such public discourse.

*Id.* at 914 (emphasis in original).

 Whether the plaintiff's speech is on a matter of public concern, the First Circuit has stated, is not a question for the jury, but one of law for the court. *See id.* at 912. The Jury's answers, however, may provide factual context that aids the court in its decision. In the case at hand, the Jury returned answers regarding the purpose of plaintiff Lynch's telephone call as follows:

1. *In Ms. Lynch's telephone call of January 12, 1994, did she discuss any of the following matters?*

*(a)(1) Inadequate services to homeless people provided by the Emergency Shelter Commission*

 _X_ YES ___NO

*(a)(2) People in need of help being unable to obtain help quickly enough from the Emergency Shelter Commission*

 _X_ YES ___NO

*(a)(3) Any matter that was of personal concern to her alone*

 _X_ YES ___NO

*(b) Objection to an activity, policy, or practice of the Emergency Shelter Commission*

 _X_ YES ___NO

Although the matters discussed in plaintiff's call may not be characterized as relating to official misconduct, they also were not

limited to internal personnel procedures. The jury found that plaintiff discussed matters that were of personal concern to her, and that she also discussed inadequate services to the homeless, people in need of help being unable to obtain help quickly enough, and her objections to activities, policies and practices of the Emergency Shelter Commission.

The defendants argue that because the jury did not find that these concerns were objectively reasonable, *see* Phase One Verdict Form, Part I, Questions 2(b)(1)-(2), the plaintiff's speech does not rise to the level of speech on matters of public concern. *See* Defendant Kelley Cronin's Memorandum of Law in Support of Her Motion for Judgment as a Matter of Law After Trial or in the Alternative for a New Trial or Remittitur at p. 6 (Docket No. 160). Objective reasonableness, however, is not the applicable standard with respect to the matter under consideration at this point. The questions in the Verdict Form referring to objective reasonableness were included in order to address plaintiff's claim under the Massachusetts Whistleblower Statute, which requires, in certain circumstances, that a whistleblower have an objectively reasonable basis for believing that a risk to public health, safety, or the environment existed. *See* Mass. Gen. L. ch. 149, § 185(c)(2).

The defendants also argue that the court should focus on what defendant Cronin believed was said by the plaintiff in the telephone call to determine whether the plaintiff's speech was on matters of public concern. In support of this argument, the defendant cites to the syllabus of *Waters v. Churchill,* 511 U.S. 661, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994), for the proposition that the *Connick* test should be applied to what the government employer reasonably thought was said, not what the trier of fact ultimately determines was said. *See* Defendant Kelley Cronin's Memorandum of Law in Support of Her Motion for Judgment as a Matter of Law After Trial or in the Alternative for a New Trial or Remittitur at p. 7 (Docket No. 160).

This defense argument is without merit. In *Waters,* the Court did note that government employers attempting to reach their own factual conclusions must not be held to the evidentiary rules used in court. *Waters,* 511 U.S. at 676, 114 S.Ct. at 1888. For example, it might be entirely appropriate for a government employer to rely on hearsay, even if inadmissible in court proceedings, in determining what was said by an aggrieved employee. *Id.* But the Court also stated that lower courts applying the *Connick* test should not take the facts "as the employer thought them to be, without considering the reasonableness of the employer's conclusions." *Id.* at 677, 114 S.Ct. at 1889. Thus, an objective test is appropriate for use in determining what the employer thought the speech to be. And here, there is not a shred of evidence in the record to show that defendant Cronin believed Ms. Lynch's telephone call related only to matters of personal concern (that is, that the plaintiff's call did not address staffing of the Emergency Shelter Commission or services to homeless people).

Not only did defendant Cronin fail to present evidence on "her view" of what matters plaintiff discussed in her telephone call, but several witnesses, including defendant's husband, John Greeley, and the director of the Mayor's 24–Hour Hotline, Jerry Cuddyer, stated under oath that the plaintiff discussed inadequate services to homeless people. Even if defendant Cronin believed that the plaintiff's call concerned matters of only private concern, that belief was unreasonable in light of the testimony adduced at trial.

Thus, I conclude that it is irrelevant whether the plaintiff was objectively reasonable in her belief that the staffing policies of the Emergency Shelter Commission constituted a risk to public health. I conclude, also, that a belief by defendant Cronin that plaintiff discussed only matters of private concern in her telephone call would be an unreasonable one. I conclude that the evidence received during the trial showed beyond genuine dispute that the matters discussed in plaintiff's telephone call (specifically that she believed that the Emergency Shelter Commission was providing inadequate services to homeless people and that homeless people in

need of help were not receiving help quickly enough) were matters of "inherent" public concern.

Moreover, the community had "in fact manifested a legitimate concern in the internal workings" of all the mayoral departments, as evidenced by exhibit number 26, the Mayor's letter to City employees seeking feedback on the efficiency and possible improvement of City operations. Granted, the plaintiff's telephone call was not made to the automated voice-mail system established by the Mayor's Office for this purpose, but the call was made to the Mayor's Office. The plaintiff's expression was not made as a letter to the editor of a newspaper, or as part of a discussion on talk radio. These forms and methods of expression might be evaluated as likely to be far more disruptive than a telephone call or a quiet visit to the Mayor's office. The form of the plaintiff's expression suggests a subjective intent to contribute to the public discourse, in a way that would not be disruptive.

### F. Applying Qualified Immunity to First Amendment Claims

#### 1. More About Precedents on Balancing

■ Once a court determines that a plaintiff spoke on a matter of public concern, the court must aim at striking an appropriate balance after weighing the employee's First Amendment interest, together with any public interest in that speech, against the strength of the government interest in promoting efficiency in accomplishing government services to the community. *See Pickering,* 391 U.S. at 568, 88 S.Ct. at 1734.

The plaintiff, even though the jury found that she was not an employee at the time of the speech at issue, obviously had a strong and legitimate interest in being able to exercise her First Amendment rights and to continue serving as a contractor to the City of Boston.

Among the considerations to be weighed, in a balancing test adapted to the distinctive circumstances of this case, is the plaintiff's motivation for speaking. *See O'Connor,* 994 F.2d at 915. The jury found that the plaintiff discussed matters of personal concern

during her telephone call. *See* Phase One Verdict Form, Part I, Question 1(a)(3). Defendant Cronin argued that plaintiff's telephone call was made to criticize defendant Cronin's administration of the Emergency Shelter Commission at a time of mayoral transition in an effort to force defendant Cronin to resign. The jury finding cannot reasonably be construed as saying this was the sole motivation of plaintiff's telephone call, but is consistent with the defense contention that this was one among other reasons for the call, and the weight of plaintiff's legitimate interest in making the call is somewhat lessened by the likelihood that she had this kind of personal interest in making the telephone call.

The balancing must also take account of the public's interest in the plaintiff's speech. Here, an assessment of the reasonableness of the plaintiff's belief that public health was at risk, is relevant. The jury finding that this belief was not reasonable sharply reduces the weight of the public interest in this aspect of her speech. On the other hand, the public has a separate interest, apart from public health, in having the contributions to public discussion of persons who are concerned and informed. This public interest extends not only to citizens generally but also to those who are City of Boston employees, contractors, former employees, and former contractors. The weight of this interest was reinforced by published requests of the Mayor for suggestions about how to make City government work better. I conclude that in addition to the plaintiff's interest, this case involves a significant public interest in encouraging employees and contractors of the City of Boston to respond to mayoral requests for information about potential avenues of improvement in City services.

On the other side of the weighing process, the City has not demonstrated a significant interest, as employer, in curtailing the disclosures by plaintiff. The City has not shown disruption in the operations of City government except for the minor difficulties experienced by Mr. Greeley and Ms. Cuddyer in taking a complaint regarding Mr. Greeley's wife. Nor has there been any showing of inefficiencies experienced at the Emergency

Shelter Commission as a result of the telephone call, except, perhaps, on the day that the defendant Cronin confronted the plaintiff in the Commission offices. Nor has the City shown any deterioration in the working relations among staff members of the Commission.

In essence, the plaintiff's telephone call did not hinder either the efficiency of City government as a whole, or that of the Emergency Shelter Commission in particular. Thus, the City's interest in efficiency is minimal in the circumstances of this case, and is far outweighed by the plaintiff's interest in freedom to speak and the public interest in encouraging response to mayoral requests for performance improvement suggestions and information.

## 2. Motivating Factors

If a plaintiff succeeds in showing that speech is on a matter of public concern, and that the plaintiff's and the public's interest in the speech outweigh the governmental interest in efficiency, still at least one more requirement must be satisfied for a plaintiff to succeed on a claim for damages for an adverse employment decision. The plaintiff must also obtain from the court or jury a determination that the "protected expression was a substantial or motivating factor in that adverse employment decision." *O'Connor*, 994 F.2d at 912. The burden of persuasion on the issue may be shifted to the employer in these circumstances, but at least the government employer is given the opportunity to show that it would have reached the same decision even in the absence of the protected expression. *Id.* (*citing Mt. Healthy*, 429 U.S. at 287, 97 S.Ct. at 576).

By analogy to these settled rules, I conclude that the plaintiff in this case cannot succeed in her claim for damages for violation of rights regarding protected speech without a determination that she was speaking on issues of public concern and that her interest and the public interest in the exercise of plaintiff's First Amendment rights outweigh the City of Boston's interest in efficient operation of government. By analogy also, however, I conclude that, shouldering the burden of persuasion, the City is entitled to the opportunity to prove that it would have reached the same decision anyway with respect to the nonrenewal of the plaintiff's contractual relationship with the City. *See Mt. Healthy*, 429 U.S. at 274, 97 S.Ct. at 569. The City failed to satisfy that burden in this case.

The plaintiff has shown that retaliation was a motivating factor for Kelly Cronin's prompt reaction to the telephone call of January 12, 1994. The jury answered "YES" in response to Question 1(a) of Part II of the Phase One Verdict Form that "Kelley Cronin, in instructing the plaintiff, on January 13, 1994, to clear out her desk act[ed] with a motive of retaliating for Ms. Lynch's telephone call of January 12, 1994."

The defendant Cronin's argument that plaintiff does not have a constitutional right to her desk, misses the point. When the defendant instructed the plaintiff to clear out her desk, the defendant Cronin, at that time, interfered with the plaintiff's advantageous relationship with the City of Boston and reasonable expectations regarding terms and conditions of the continuation of an advantageous relationship. The jury found that, up to that point, the plaintiff had a reasonable expectation of employment for the 1994 Can Share program. *See* Phase One Verdict Form, Part II, Question 5(a)(2). It does not matter that the defendant Cronin later reorganized the Commission to eliminate any potential contract for the plaintiff. An interference occurred at the time the defendant Cronin instructed the plaintiff to clear out her desk.

Thus, the interference that is a prerequisite to municipal liability as well as Cronin's liability individually was found by the jury. Before municipal liability can be determined, however, the special limitation on respondeat superior liability must be overcome; and before Cronin's liability individually can be determined, the federal law requirement of a clearly established right must be satisfied.

With respect to plaintiff's First Amendment claim, I conclude for reasons explained in Part VI.B that qualified immunity blocks the claim. On the other hand, with respect to plaintiff's claim that defen-

dant Cronin intentionally interfered with plaintiff's advantageous noncontractual relationship of reasonable expectancy of renewal of a temporary contract, I conclude that plaintiff has succeeded. The jury found that defendant Cronin acted with a motive of retaliation when she told plaintiff to clear out her desk on January 13, 1994. In the context of the entire verdict, I conclude that the purpose of retaliation was a motivating factor for the intentional interference with the advantageous noncontractual relationship. The federal law of qualified immunity defeats the plaintiff's claim that this violation rose to the level of a constitutional tort remediable under 42 U.S.C. § 1983, for reasons explained in Part VI.B, but defendant Cronin's conduct and retaliatory motive satisfy the requirements of a state-law cause of action for interference with the advantageous noncontractual relationship that involved a reasonable expectation of renewal of a temporary contractual relationship.

The defendant argues that she would have reorganized the Can Share position and terminated the plaintiff's business relationship with the City of Boston even in the absence of the plaintiff's protected speech. The interference with the advantageous relationship commenced, however, on January 13, 1994, not when the defendant later reorganized the position. The jury found that the nonretaliatory reasons offered by defendant Cronin for telling plaintiff to clear out her desk (the need for desk space and the end of the 1993 Can Share program) were pretextual. *See* Phase One Verdict Form, Part II, Questions 2(b)(2) and (4). The defendant has failed to show that she would have ordered the plaintiff to clear her desk in the absence of her motive of retaliation.

### 3. An Alternative Determination Favoring Allowance of the First Amendment Claim Against Defendant Cronin

As explained above, First Circuit precedents regarding the effect of a balancing test on qualified immunity, as I understand them, require the conclusion I have reached: that qualified immunity protects defendant Cronin against an award based on the jury's finding that in telling plaintiff on January 13,

1994 to clear out her desk Ms. Cronin acted with a motive of retaliating against plaintiff for the telephone call of January 12, 1994.

Because this determination depended on a reasonably debatable interpretation of precedents, and I recognize that it may be overturned on appeal, I have considered other issues that bear upon what judgment should be ordered in the event this ruling is overturned. I conclude, on this alternative assumption, that plaintiff has satisfied all other requirements of a viable First Amendment claim for the reasons explained in Parts VI. F(1)-(2) above, and that, on this alternative assumption, plaintiff's First Amendment right that defendant Cronin not take action against her such as defendant Cronin took on January 13, 1994, in retaliation for the telephone call, was clearly established before January 12, 1994.

For these reasons, if not constrained by my interpretation of precedents on the effect of a balancing test on qualified immunity, I would order judgment for plaintiff in the additional amount of $10,000 in punitive damages, and in addition, $60,000 in attorney fees in view of her being a prevailing party to this extent. I would cap the allowance of attorney fees at $60,000 because, even with this added recovery, (i) plaintiff would be a prevailing party only with respect to a comparatively small segment of the case as a whole, (ii) the contemporaneous records of time spent are wholly inadequate to allow a reasoned identification of time spent on issues at least related in part to those on which plaintiff would have prevailed under this alternative ruling, and (iii) an award in a higher amount against an official whose annual salary was less than this amount would not be in the interests of justice.

### VII. Claims for Harm to Reputation

■ Compensatory damages for the violation of a constitutional right may include compensation not only for out-of-pocket losses but also, in some circumstances, for impairment of reputation and mental anguish. *See Memphis Community Sch. Dist. v. Stachura*, 477 U.S. 299, 307, 106 S.Ct. 2537, 2543, 91 L.Ed.2d 249 (1986).

■ Determination of the circumstances relevant to a potential award in this case depends on applicability of qualified immunity, which in turn depends on the concept of a "clearly established" right.

■ The asserted right to an award of damages for harm to reputation, absent other factors, is not a "clearly established" constitutional right. Interest in reputation is not a liberty or property interest guaranteed against state deprivation without due process of law. *See Paul v. Davis*, 424 U.S. 693, 708, 96 S.Ct. 1155, 1164, 47 L.Ed.2d 405 (1976). Rather, the plaintiff must suffer governmental action altering a right or status previously held under state law in addition to the injury to reputation. *Id.* at 708–709, 96 S.Ct. at 1164. As stated in precedents, the plaintiff must be stigmatized, and also must be stigmatized in connection with a denial of a right or status previously recognized under state law. *See Rodriguez de Quinonez v. Perez*, 596 F.2d 486, 489–90 (1st Cir.1979).

The jury awarded plaintiff Lynch damages for injury to reputation based both on the termination of her relationship with the City of Boston and on her removal from the Mayor's Hunger Commission. If either of these awards contains the elements of stigma plus, plaintiff Lynch may have a viable claim for a constitutional violation, as to which the requirements of harm and causation have been satisfied, based on damage to reputation, associated with a status recognized under state law other than the law of defamation alone. Of course, the viability of each of these claims would be subject also to a determination regarding qualified immunity in relation to the particular claim.

■ Harm to reputation caused by a loss of employment alone does not rise to the level of a constitutional violation. *See Beitzell v. Jeffrey*, 643 F.2d 870, 879 (1st Cir. 1981) (refusal to grant tenure did not result in the loss of a property interest). Nor does the loss of outside private employment come within the ambit of a constitutionally protected property interest. *See Wilmarth v. Georgetown*, 28 Mass.App.Ct. 697, 555 N.E.2d 597, 601, *rev. denied*, 408 Mass. 1103, 560 N.E.2d 121 (1990). "It stretches the concept too far to suggest that a person is deprived of 'liberty' when he simply is not rehired for one job but remains as free as before to seek another." *Board of Regents v. Roth*, 408 U.S. 564, 575, 92 S.Ct. 2701, 2708, 33 L.Ed.2d 548 (1972).

The question becomes not just whether plaintiff Lynch was not rehired, but whether she had some state-law protected special opportunity to seek another position. The jury found that Helen Lynch was not an employee at the time that defendant Cronin instructed her to clear out her desk. Rather, the jury found she had an expectation of a future employment contract.

■ Although plaintiff cannot establish a liberty interest at stake, the court must consider whether she may be able to establish a property interest. Property is not narrowly defined to include only real estate, chattels, or money. The definition of property interest is extended to include an "interest that a person has already acquired in specific [government] benefits." *Id.* at 572, 92 S.Ct. at 2706.

■ In order for the plaintiff to demonstrate that she has already acquired a specific government benefit, plaintiff must show that she has "a legitimate claim of entitlement to it." *Id.* Although plaintiff Lynch may have expected a renewal of her contract for the 1994 Can Share program, nothing prevented the City from not renewing the contract. Plaintiff did not have "a legitimate claim of entitlement" to the benefit of a 1994 contract.

Where a plaintiff sought damages for injury to reputation stemming from a disparaging letter of recommendation that caused him to lose his current job and future government employment, the Supreme Court determined that his failure "to establish the violation of any right at all" made it impossible for him to overcome qualified immunity. *Siegert v. Gilley*, 500 U.S. 226, 233, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991). Similarly, plaintiff Lynch cannot establish the violation of any property interest at all by showing the termination and nonrenewal of her business relationship with the City of Boston, when her expectation of future employment

was not supported by a state-law entitlement to enforceability of her expectation.

The same conclusion applies, and on essentially the same reasoning, to plaintiff's claim for harm to her reputation associated with loss of plaintiff's position on the Hunger Commission. To whatever extent her being on that Commission was as a representative of the City of Boston or one of its departments or officials, the position was appointive, with the period of service under each appointment being at the discretion of·one or another among the persons to whom the Mayor delegated appointing authority and the Mayor himself. The evidence showed that for some period of time in the past, and perhaps continuing beyond January 1994, the plaintiff had served on the Hunger Commission, or a predecessor entity, as a representative of an entity other than the City of Boston or any of its agencies, but the record does not contain any proffer of evidence by the plaintiff sufficient to support even a preponderance-of-the-evidence finding that a reasonable municipal official in the position of defendant Kelley Cronin would have known that her not approving or appointing plaintiff Lynch to serve on the Hunger Commission as a City representative was a violation of a clearly established right. Thus, plaintiff cannot overcome qualified immunity with respect to her claim regarding her status on the Hunger Commission. Both this claim against defendant Cronin as an independent claim and the claim against Kelley Cronin of harm to reputation associated with loss of her position on the Hunger Commission are defeated, as a matter of law, by qualified immunity.

## VIII. Claims for Interference with Advantageous Relationships

The jury answered the following questions that bear upon plaintiff's assertions of intentional interference by defendant Kelley Cronin with plaintiff's relationship with the City of Boston:

*7. Did Ms. Cronin act with a state of mind described in one or more of parts (a)— (c):*

*(a) With the purpose of interfering with*

*(1) an advantageous contractual relationship of plaintiff with the City of Boston?*

_____*YES* *X NO*

*(2) an advantageous non-contractual relationship of plaintiff with the City of Boston?*

*X YES* _____*NO*

*(b) With awareness that her act would interfere with*

*(1) an advantageous contractual relationship of plaintiff with the City of Boston?*

_____*YES* *X NO*

*(2) an advantageous non-contractual relationship of plaintiff with the City of Boston?*

*X YES* _____*NO*

*(c) With awareness that her act would interfere with and willfully with respect to that interference*

*(1) an advantageous contractual relationship of plaintiff with the City of Boston?*

_____*YES* *X NO*

*(2) an advantageous non-contractual relationship of plaintiff with the City of Boston?*

*X YES* _____*NO*

Thus, the jury found that Ms. Cronin acted willfully and with awareness to interfere purposefully with the plaintiff's non-contractual relationship with the City of Boston.

Defendant Cronin argues that the court should order judgment as a matter of law for defendant Cronin, rejecting plaintiff's claim of intentional interference with an advantageous business relationship. Defendant advances the following reasons: (1) that interference was impossible since the 1994 Can Share Coordinator position did not exist; (2) that "Defendants cannot be held liable for their own refusal to contract with Helen Lynch, irrespective of their motives;" and (3) that any interference that did occur was not "wrongful." Defendant Kelley Cronin's Memorandum of Law in Support of Her Motion for Judgment as a Matter of Law After

Trial or in the Alternative for a New Trial or Remittitur at p. 11 (Docket No. 160).

■ A claim of intentional interference with advantageous relations requires proof of four separate elements: (1) that a business relationship existed; (2) that defendant knew of such a relationship; (3) that defendant intentionally and improperly interfered with that relationship; and (4) that plaintiff suffered a loss as a result of that interference. *See United Truck Leasing Corp. v. Geltman,* 406 Mass. 811, 814–16, 551 N.E.2d 20, 22 (Mass.1990).

■ Defendant's argument that interference was not possible because the position no longer existed is without merit. An interference occurred on the day that the defendant ordered the plaintiff to clear out her desk. For this reason, the claim is not defeated simply because the defendant later reorganized the position, or hired Mr. Markland for the new position. A subsequent reorganization cannot protect the defendant from liability arising out of intentional interference that occurred when the possibility still existed for the plaintiff to be hired as the 1994 Can Share Coordinator.

■ The defendant is correct in asserting that one cannot be held liable for tortious interference with its own relationship with another. *See Riseman v. Orion Research Inc.,* 394 Mass. 311, 314, 475 N.E.2d 398, 400 (1985). This, however, does not protect defendant Cronin, because she did not interfere with a relationship with herself. She interfered with a relationship between plaintiff and the City of Boston. Furthermore, the interference with the City relationship was Cronin's not the City's, because, with ample support in the evidence before them, the jury found that defendant Cronin was not acting within the scope of her authority when she told the plaintiff to clear out her desk and that she was acting with the motive of retaliation for the telephone call. *See* Phase One Verdict Form, Part II, Question 1(b).

■ I conclude that the plaintiff has satisfied the four elements required for a showing of intentional interference with an advantageous relationship.

First, beyond dispute the plaintiff served as the Can Share Coordinator each year between 1987 and 1994, when the position was reorganized. In addition, the jury found that on January 12, 1994, the plaintiff had a reasonable expectation of employment for the 1994 Can Share program. *See* Phase One Verdict Form, Part I, Question 5(a)(2).

Second, beyond dispute defendant Cronin, as the plaintiff's supervisor in previous years, knew of the plaintiff's relationship with the City of Boston.

Third, the jury found wrongful interference when they found that the defendant, in instructing the plaintiff to clear out her desk, acted with a motive of retaliating for the plaintiff's telephone call. *See* Phase One Verdict Form, Part II, Question 1(a).

Finally, the plaintiff suffered harm, in the form of the emotional distress for which the jury awarded $4,000 compensatory damages in answering Part III, Question 10(a). This harm commenced occurring on January 13, 1994, when the defendant told the plaintiff to clear out her desk. The cause of action having accrued and some harm having been done, the defense argument that the entire claim is defeated by the later nonexistence of the position is plainly without merit.

## IX. Claims for Emotional Distress

Plaintiff did not make a separate claim for emotional distress based on the theory of outrageous conduct and intentionally caused severe emotional distress. Moreover, the evidence in this case, as a matter of law, was insufficient to support such a claim under the rigorous requirements of Massachusetts law.

Rather, plaintiff claimed emotional distress based on wrongful discharge in violation of the First Amendment (Count I), wrongful discharge in violation of the Massachusetts Whistleblower statute (Count II), violations of Massachusetts Equal Rights Act (Counts III and IV), and violation on the theory that state law allows recovery for intentional infliction of emotional distress without proof of outrageous conduct (Count V). Plaintiff's Complaint, Docket No. 2.

The jury awarded plaintiff $4,000 in response to a question submitted on emotional

distress associated with the instruction on January 13, 1994 to clear out her desk. The Final Judgment ordered by the court identified Count I (the alleged First Amendment violation) as the basis for the damages awarded for emotional distress. Plaintiff now contests that identification and argues that the award of damages for emotional distress should be based on defendant Cronin's intentional interference with plaintiff's non-contractual advantageous relationship with the City of Boston. The validity of plaintiff's contention that she is still entitled to a judgment against defendant Cronin on the finding of emotional distress, despite the failure of her First Amendment claim by reason of qualified immunity, depends on her assertion that state law supports awards for emotional distress even without associated findings of severity of the emotional distress, nature of emotional distress other than that associated with actionable physical injury, intent as to its severity, and outrageousness of the conduct.

At the time of fashioning the verdict form and charge to the jury, still at the time of ordering judgment on October 16, 1997, and still today, I consider this a close and debatable question. This was the reason for not identifying anything but the First Amendment claim as the basis for including $4,000 for emotional distress in the judgment.

█ A plaintiff may recover for emotional distress based, parasitically, on another intentional tort claim. *See, e.g., Draghetti v. Chmielewski*, 416 Mass. 808, 815, 626 N.E.2d 862, 868 (Mass.1994) (emotional distress based on defamatory injury to reputation); *Mailhiot v. Liberty Bank & Trust Co.*, 24 Mass.App.Ct. 525, 510 N.E.2d 773, 777 (1987) (emotional distress damages based on tortious interference with employment relationship).

█ Although a showing of physical symptoms is required for negligent infliction of emotional distress, *see Sullivan v. Boston Gas*, 414 Mass. 129, 132, 605 N.E.2d 805, 807 (Mass.1993), no showing of physical injury is required where the emotional distress is caused by extreme and outrageous conduct. *See Agis v. Howard Johnson*, 371 Mass. 140, 142, 355 N.E.2d 315, 318 (1976). The rea-

sons for requiring physical symptoms in negligence cases are that such distress may be too temporary to warrant recovery, distress can be feigned or imagined, and negligent defendants are less culpable. *See Payton v. Abbott Labs*, 386 Mass. 540, 549–50, 437 N.E.2d 171, 177 (Mass.1982). On the other hand, evidence of a defendant's intent to cause emotional distress, or knowledge that substantial emotional distress would be likely to occur in view of the nature of the defendant's intended affront, tends strongly to suggest a finding of genuine emotional distress even without physical injury. *See Payton*, 386 Mass. at 548, 437 N.E.2d at 176.

█ No Massachusetts case appears to be directly on point with respect to the distinctive circumstances of this case. The Supreme Judicial Court in *Payton* required no physical injury for emotional distress resulting from defamation. *Payton*, 437 N.E.2d at 176. The Massachusetts Court of Appeals extended the *Payton* ruling by not requiring physical symptoms for emotional distress based on tortious interference with an employment relationship. *See Mailhiot*, 510 N.E.2d at 777. I conclude that it is likely, based on analogy to the existing Massachusetts precedents cited above, that Massachusetts courts will not require physical injury as a prerequisite to an award of damages for substantial emotional distress associated with intentional interference with an advantageous relationship. I conclude also that the evidence received for consideration by the jury in this case was sufficient to support their finding in the amount of $4,000.

Even though still regarding the issue as close and debatable, I conclude for the reasons explained immediately above that an award for this $4,000 finding is sustainable under Count V, for intentional interference with an advantageous relationship. Having also concluded that the First Amendment award must be vacated under First Circuit precedents on qualified immunity, the $4,000 award and associated prejudgment interest will be included in the Amended Final Judgment as an award only under Count V.

## X. More About Defendant Cronin's Post–Judgment Motions

### A. Motion for New Trial

 A new trial may be granted if the trial judge "believes that the outcome is against the clear weight of the evidence such that upholding the verdict will result in a miscarriage of justice." *Davet v. Maccarone,* 973 F.2d 22, 29 (1st Cir.1992) (citations omitted). I find that the jury's verdict was not against the weight of the evidence, therefore the portion of defendant's motion (Docket No. 159) that seeks a new trial is DENIED.

### B. Motion for Judgment as a Matter of Law After Trial

 Defendant Cronin requests that this court set aside the jury verdict and order judgment for her as a matter of law. A trial court may grant a motion for judgment as a matter of law after a jury verdict if "reasonable persons could not have reached the conclusions that the jury embraced." *Sanchez v. Puerto Rico Oil Co.,* 37 F.3d 712, 716 (1st Cir.1994) (citations omitted). To put it another way, if there is substantial evidence supporting the verdict, it is improper for a court to order the Clerk to enter judgment notwithstanding the verdict. *Conway v. Electro Switch Corp.,* 825 F.2d 593, 598 (1st Cir.1987).

As stated more generally in Part III above, and in relation to the $4,000 finding in Part IX, I find that the verdict the jury reached in this case is well supported by the evidence. Furthermore, I conclude that most of defendant Cronin's legal arguments for judgment regardless of the jury's findings are rebutted by well-settled law, as explained in Parts VII–IX above. In relation to qualified immunity, however, some close and debatable issues of law have been presented. They are considered in Part V and VI above. As explained in Part VI.F, I conclude that the defendant Cronin is entitled to judgment as a matter of law on the claims identified there as claims to which qualified immunity is applicable. Therefore, the portion of defendant's motion (Docket No. 159) that seeks judgment as a matter of law is to this extent ALLOWED. Defendant Cronin's motion is DENIED in all other respects.

### C. Remittitur

Remittitur is appropriate where a finding of punitive damages is excessive. Defendant's request for remittitur as to the finding of punitive damages in this case is mooted because the punitive damages award is barred by defendant's qualified immunity. If, however, the punitive damages award were to be made, the jury finding of $10,000 in punitive damages is not excessive. The plaintiff earned approximately $12,000 to run the Can Share program each year under contract with the City of Boston. Furthermore, defendant Cronin's salary is approximately $58,000 annually. *See* Transcript of October 1, 1997. Thus, I conclude that $10,000 would not be an excessive punitive damages award, if a higher court should conclude, contrary to my order, that punitive damages are allowable under federal law applicable to this case.

## XI. Attorney Fees and Costs

Plaintiff Lynch filed an Application for Attorneys' Fees and Costs (Docket No. 163, filed October 30, 1997) seeking a total of $359,664.80 in fees and $10,159.73 in costs. The basis of plaintiff's request is 42 U.S.C. § 1988 which allows plaintiffs to recover attorney fees in civil rights actions in order to enable plaintiffs with limited funds to pursue their claims.

In light of my rulings above with respect to qualified immunity, the plaintiff is not a prevailing party as contemplated by 42 U.S.C. § 1988.

 The plaintiff was successful, however, on Count V of her complaint, under state law. The jury awarded her $4,000 for emotional distress associated with the defendant's intentional interference with plaintiff's advantageous relationship with the City of Boston. Because this is a claim made under state law, and the determination for an award of costs and fees is substantive, in relation to the determination as to whether state or federal law applies, I conclude that state law applies. I conclude

that this outcome is appropriate even though jurisdiction in this court is supplemental to federal-question jurisdiction, rather than diversity jurisdiction. Massachusetts Rules of Civil Procedure allow the award of costs to the prevailing party. Mass. R. Civ. Pro. 54(d); *see also* Mass. Gen. L. ch. 261, § 1. The award of costs is within the discretion of the trial judge. *See* Mass Gen. L. ch. 261, § 13.

 Massachusetts generally employs the American Rule that each party must bear her own expenses of litigation. *See Creed v. Apog,* 377 Mass. 522, 525, 386 N.E.2d 1273, 1275 (Mass.1979). Costs ordinarily do not include counsel fees. *See Chartrand v. Riley,* 354 Mass. 242, 244, 237 N.E.2d 10, 12 (Mass.1968). Rather costs may include a variety of costs such as the costs for travel and attendance of witnesses, depositions, and other evidence. Because the plaintiff prevailed only on one of her state-law claims, and both parties bear responsibility for the extensive costs associated with this case, I conclude that the fairest and most appropriate order is that each party will bear its own costs. Thus, plaintiff's Application for Attorneys' Fees and Costs (Docket No. 163, filed October 30, 1997) is DENIED.

### Order

For the foregoing reasons, it is hereby ORDERED:

(1) Plaintiff's Motion to File Reply to Opposition to Plaintiff's Motion to Alter or Amend Judgment (Docket No. 172, filed November 11, 1997) is ALLOWED, in part only, as explained in Part III above;

(2) Plaintiff's Emergency Motion for Leave to Supplement Opposition to Motion for Judgment as a Matter of Law or in the Alternative for a New Trial or Remittitur (Docket No. 173, filed November 11, 1997) is ALLOWED, in part only, as explained in Part III above;

(3) Plaintiff's Motion to Add Addendum to Her Emergency Motion for Leave to Supplement Opposition (Docket No. 176, filed October 17, 1997) is ALLOWED, in part only, as explained in Part III above;

(4) Defendant Kelley Cronin's Motion for Judgment as a Matter of Law or in the Alternative for a New Trial or Remittitur (Docket No. 159, filed October 27, 1997) is ALLOWED in part—that is, to the extent that it seeks qualified immunity for defendant Cronin on Count I—and in all other respects DENIED;

(5) Plaintiff's Motion to Alter or Amend Judgment Under Rule 59(e) with Rule 7.1 Certificate (Docket No. 161, filed October 27, 1997) is ALLOWED, in part only to the extent described in Part IX above;

(6) Plaintiff's Assented–To Motion for Leave to File a Reply Brief in Support of Her Application for Attorneys' Fees and Costs (Docket No. 179, filed November 26, 1997) is ALLOWED, in part only to the extent described in Part III above;

(7) Plaintiff's Application for Attorney Fees and Costs (Docket No. 163, filed October 30, 1997) is DENIED;

(8) The Clerk is directed to enter on a separate document, accordingly, an AMENDED FINAL JUDGMENT as follows:

(i) awarding plaintiff judgment against defendant Kelley Cronin in the amount of $4,846 (which includes $846 in prejudgment interest up to October 16, 1997 when judgment was first entered) as compensation for harm compensable under her state-law claim for intentional interference with plaintiff's advantageous relationship under Count V of the complaint;

(ii) in all other respects awarding judgment for defendants;

(iii) declaring that each party will bear that party's own costs; and

(iv) declaring that the monetary award will bear postjudgment interest at the federal judgment rate of 5.44% per annum from October 16, 1997.

### Amended Final Judgment

The five-count complaint in this case originally named the City of Boston, Kelley Cronin, Ann Maguire, and John Greeley as defendants.

By stipulation of dismissal (Docket No. 37, filed May 29, 1997), the parties agreed to the dismissal of John Greeley as a defendant.

This civil action came before the court for a trial by jury as to all other claims. By rulings during trial, the court determined as a matter of law some issues bearing on claims and defenses, ordered that the case be submitted to the jury in two phases, and ordered in each phase that the verdict be in the form of answers to special questions under Rule 49(a) of the Federal Rules of Civil Procedure.

The court determined before ordering judgment to be entered (on October 16, 1997) that answers to the questions in the Phase One and Phase Two Verdict Forms (which are recited below) required judgment for the plaintiff against Kelley Cronin on Count I based on a First Amendment violation and on Count V based on intentional interference with advantageous relations, and judgment for defendants in all other respects.

The court thereafter considered post-judgment motions and, for the reasons explained in an Opinion of this date, sustained in part defendant Kelley Cronin's motion for judgment notwithstanding the verdict, on grounds of qualified immunity, and determined that the part of the judgment against her on the First Amendment claim, including punitive as well as compensatory damages, must be vacated. Having made these rulings, the court determined to order that an amended judgment be entered in favor of defendant Cronin on Count I. This amended judgment includes the award for plaintiff against defendant Cronin on Count V (for intentional interference with plaintiff's advantageous relationship) in the amount of $4,000 in damages for emotional distress as found by the jury. The amended judgment also makes no award of attorney fees because the court has denied plaintiff's motion for attorney fees. In all other respects the court has denied motions for modification of the judgment.

The material answers of the jury were as follows:

## I. Circumstances of the Telephone Call

1. In Ms. Lynch's telephone call of January 12, 1994, did she discuss any of the following matters?

(a)(1) Inadequate services to homeless people provided by the Emergency Shelter Commission

 X YES NO

(a)(2) People in need of help being unable to obtain help quickly enough from the Emergency Shelter Commission

 X YES NO

(a)(3) Any matter that was of personal concern to her alone

 X YES NO

(b) Objection to an activity, policy, or practice of the Emergency Shelter Commission

 X YES NO

IF YOU ANSWER 1(b) YES, GO TO 2. IF YOU ANSWER 1(b) NO, SKIP TO 3.

2. Did Ms. Lynch believe that the activity, policy, or practice of the Emergency Shelter Commission that she objected to in her January 12, 1994 phone call

(a)(1) was a violation of public policy?

 X YES NO

(a)(2) constituted a risk to public health, safety, or the environment?

 X YES NO

IF YOU ANSWER EITHER PART OF 2(a) YES, GO TO 2(b) AND 2(c). IF YOU ANSWER BOTH PARTS OF 2(a) NO, SKIP TO 3.

2(b)(1). Did Ms. Lynch have an objectively reasonable basis for believing

(A) that the activity, policy, or practice of the Emergency Shelter Commission that she objected to was a violation of public policy?

 YES X NO

(B) that the activity, policy, or practice of the Emergency Shelter Commission that she objected to constituted a risk to public health, safety, or the environment?

 YES X NO

2(b)(2). Did Ms. Lynch have an objectively reasonable basis for believing the risk to public health, safety, or the environment was of an emergency nature?

_____YES _X_ NO

2(c). Between April 13, 1994 and the date that Mr. Markland was hired for the new Staff Assistant II position, was Ms. Lynch "an employee" for purposes of applying the Massachusetts whistleblower statute?

_____YES _X_NO

(1) If the term "employee," for this purpose, has the following meaning:

An "employee" of the City of Boston is a person who, at the time stated, _currently has a job with the City_, in which job he or she works under a supervisor to whom the City has given authority to direct and control the work performance.

_____YES _X_NO

(2) If, instead, the term "employee," for this purpose, has the following meaning:

An "employee" of the City of Boston is a person who, at the time stated, _currently has a job with the City, or a firm commitment to have a job with the City within a reasonable period of time,_ in which job he or she works under a supervisor to whom the City has given authority to direct and control the work performance.

_____YES _X_NO

(3) If, instead, the term "employee," for this purpose, has the following meaning:

An "employee" of the City of Boston is an individual who, at the time stated, _performs services for and under the control and direction of the City of Boston for wages or other remuneration._

_____YES _X_NO

(4) If, instead, the term "employee," for this purpose, has the following meaning:

An "employee" of the City of Boston is an individual who, at the time stated, _had previously performed services for and under the control and direction of the City of Boston_

(A) for compensation.

_X_ YES _____NO

(A) as a volunteer.

_____YES _X_ NO

(5) If, instead, the term "employee," for this purpose, has the following meaning:

An "employee" of the City of Boston is an individual who, at the time stated, _was currently performing voluntary services for and under the control and direction of the City of Boston_

(A) for compensation.

_____YES _X_NO

(A) as a volunteer.

_____YES _X_ NO

3. At the time of her telephone call of January 12, 1994, did Ms. Lynch have one or more of the following relationships with the City of Boston?

(a) Current employee under a single, ongoing contract of employment for part-time employment during a part of the year.

_____YES _X_NO

(b) Current employee under one of a succession of temporary contracts for part-time employment during part of the year.

_____YES _X_NO

(c) Former employee under a contract of the type stated in (a).

_____YES _X_NO

(d) Former employee under a contract of the type stated in (b).

_X_ YES _____NO

4(a). At the time the City hired Mr. Markland for the new Staff Assistant II position, did Kelley Cronin have reason to believe that retaliation against employees who "blow the whistle"

(1) would be illegal?

_____YES _X_NO

(2) would, more likely than not, be illegal?

_X_ YES _____NO

4(b). At the time the City hired Mr. Markland for the new Staff Assistant II

position, did Ann Maguire have reason to believe that retaliation against employees who "blow the whistle"

 (1) would be illegal?

 ____YES X NO

 (2) would, more likely than not, be illegal?

 X YES ____NO

5(a)(1). Did Ms. Lynch, on January 12, 1994, have a reasonable expectation of employment for the remainder of the 1993 Can Share program?

 ____YES X NO

5(a)(2). Did Ms. Lynch, on January 12, 1994, have a reasonable expectation of employment for the 1994 Can Share program?

 X YES ____NO

5(b)(1). Did Ms. Lynch, at any time after January 12, 1994, and before the date Mr. Markland was hired have a reasonable expectation of employment for the remainder of the 1993 Can Share program?

 ____YES X NO

5(b)(2). Did Ms. Lynch, at any time after January 12, 1994, and before the date Mr. Markland was hired have a reasonable expectation of employment for the 1994 Can Share program?

 X YES ____NO

6. Between January and August 1994, did Kelley Cronin have the final authority to make decisions about hiring and firing at the Emergency Shelter Commission, on behalf of the City of Boston?

 X YES ____NO

7. Between January and August 1994, in her dealings with Helen Lynch concerning Ms. Lynch's employment and the employment of others at the Emergency Shelter Commission, was Kelley Cronin acting within the scope of her employment for the City of Boston?

 X YES ____NO

8. Between January and August 1994, in her dealings with Helen Lynch concerning Ms. Lynch's employment, was Anne Maguire acting within the scope of her employment for the City of Boston?

 X YES ____NO

## II. Alleged Responses

1(a). Did Kelley Cronin, in instructing the plaintiff, on January 13, 1994, to clear out her desk

act with a motive of retaliating for Ms. Lynch's telephone call of January 12, 1994?

 X YES ____NO

**IF YOU ANSWER 1(a) YES, GO TO 1(b). IF YOU ANSWER 1(a) NO, SKIP TO 2(a).**

1(b). In retaliating against Ms. Lynch by instructing her, on January 13, 1994, to clear out her desk, was Kelley Cronin

 (1) acting within the scope of authority to make a final decision on behalf of the City of Boston?

 X YES ____NO

 (2) acting within the scope of authority when she acted with the motive of retaliating because Ms. Lynch had "blown the whistle"?

 ____YES X NO

2(a). Did one or more of the defendants, on January 13, 1994, or thereafter, give a reason for the instruction to the plaintiff on January 13, 1994, to clear out her desk that was entirely or in significant part a "pretext"? ("Pretext" means that the reason(s) given were not truly and entirely the real reason(s) for the decision.)

 X YES ____NO

**IF YOU ANSWER 2(a) YES, GO TO 2(b). IF YOU ANSWER 2(a) NO, SKIP TO 3.**

2(b). Which one or more of the following gave a reason that was entirely or in part a "pretext"?

 (1) City of Boston (by giving the need for desk space as a reason)

 X YES ____NO

 (2) Kelley Cronin (by giving the need for desk space as a reason)

 X YES ____NO

 (3) Ann Maguire (by giving the end of 1993 Can Share Program as a reason)

 ____YES X NO

 (4) Kelly Cronin (by giving the end of 1993 Can Share Program as a reason)

_X_ YES \_\_\_\_NO

3(a). Did one or more of the defendants,

(1) City of Boston

(2) Kelley Cronin, and

(3) Ann Maguire

in or about early 1994, decide not to consider Ms. Lynch as a potential candidate for the new Staff Assistant II position,

(A) to retaliate for the plaintiff's telephone call of January 12, 1994?

\_\_\_\_YES _X_ NO

(B) to discriminate against plaintiff because of her age?

\_\_\_\_YES _X_ NO

(C) to discriminate against plaintiff because of her gender?

\_\_\_\_YES _X_ NO

**IF YOU ANSWER YES TO ONE OR MORE OF 3(a)(A)—3(a)(C), GO TO THE CORRESPONDING PART(S) OF 3(b). IF YOU ANSWER NO TO ALL THREE PARTS OF 3(a), SKIP TO 4.**

4(a). Did one or more of the defendants

(1) City of Boston

(2) Kelley Cronin, and

(3) Ann Maguire

give as a reason for deciding not to consider Ms. Lynch as a potential candidate for the new Staff Assistant II position one of the following:

(A) that Ms. Lynch did not apply for the position?

_X_ YES \_\_\_\_NO

(B) that Ms. Lynch was not qualified for the position?

_X_ YES \_\_\_\_NO

(C) that Ms. Cronin was expecting to hire Ms. Lynch for a different position?

_X_ YES \_\_\_\_NO

(D) that Ann Maguire did not have hiring authority?

_X_ YES \_\_\_\_NO

**IF YOU ANSWER YES TO ONE OR MORE OF 4(a)(A)—4(a)(D), GO TO 4(b). IF YOU ANSWER NO TO ALL FOUR PARTS OF 4(a), SKIP TO 5.**

4(b). Did one or more of the defendants give this reason or reasons entirely or in significant part as a "pretext?" ("Pretext" means that the reason(s) put forward were not truly and entirely the real reason(s) for the actions).

_X_ YES \_\_\_\_NO

**IF YOU ANSWER 4(b) YES, GO TO 4(c). IF YOU ANSWER 4(b) NO, SKIP TO 5.**

4(c). Which one or more of the defendants gave one of these reasons entirely or in significant part as a pretext?

(1) City of Boston:

(A) In giving as a reason that Ms. Lynch did not apply for the position:

_X_ YES \_\_\_\_NO

(B) In giving as a reason that Ms. Lynch was not qualified for the position:

\_\_\_\_YES _X_ NO

(C) In giving as a reason that Ms. Cronin was expecting to hire Ms. Lynch for a different position?

_X_ YES \_\_\_\_· NO

(2) Kelley Cronin:

(A) In giving as a reason that Ms. Lynch did not apply for the position:

_X_ YES \_\_\_\_NO

(B) In giving as a reason that Ms. Lynch was not qualified for the position:

\_\_\_\_YES _X_ NO

(C) In giving as a reason that Ms. Cronin was expecting to hire Ms. Lynch for a different position?

_X_ YES \_\_\_\_NO

(3) Ann Maguire:

(A) In giving as a reason that Ms. Lynch did not apply for the position:

\_\_\_\_YES _X_ NO

(B) In giving as a reason that Ms. Lynch was not qualified for the position:

____YES X NO

(C) In giving as a reason that Ms. Cronin was expecting to hire Ms. Lynch for a different position?

____YES X NO

5(a). Did one or more of the defendants,

(1) City of Boston

(2) Kelley Cronin, and

(3) Ann Maguire

in making the decision to hire Mr. Markland rather than Ms. Lynch for the new Staff Assistant II position, do so

(A) to retaliate for the plaintiff's telephone call of January 12, 1994?

____YES X NO

(B) to discriminate against plaintiff because of her age?

____YES X NO

(C) to discriminate against plaintiff because of her gender?

____YES X NO

**IF YOU ANSWER YES TO ONE OR MORE OF 5(a)(A)—5(a)(C), GO TO THE CORRESPONDING PARTS OF 5(b). IF YOU ANSWER NO TO ALL THREE PARTS OF 5(a), SKIP TO 6.**

6(a). Did one or more of the defendants

(1) City of Boston

(2) Kelley Cronin, and

(3) Ann Maguire

give as a reason for their actions in hiring Mr. Markland rather than the plaintiff for the new Staff Assistant II position one of the following:

(A) that Ms. Lynch did not apply for the position?

X YES ____NO

(B) that Ms. Lynch was not qualified for the position?

X YES ____NO

(C) that Ms. Cronin was expecting to hire Ms. Lynch for a different position?

X YES ____NO

(D) that Ann Maguire did not have hiring authority?

____YES X NO

**IF YOU ANSWER YES TO ONE OR MORE OF 6(a)(A)—6(a)(D), GO TO 6(b). IF YOU ANSWER NO TO ALL FOUR PARTS OF 6(a), SKIP TO PART III.**

6(b). Did one or more of the defendants give this reason or reasons entirely or in significant part as a "pretext?" ("Pretext" means that the reason(s) put forward were not truly and entirely the real reason(s) for the actions).

X YES ____NO

**IF YOU ANSWER 6(b) YES, GO TO 6(c). IF YOU ANSWER 6(b) NO, SKIP TO PART III.**

6(c). Which one or more of the defendants gave one of these reasons entirely or in significant part as a pretext?

(1) City of Boston:

(A) In giving as a reason that Ms. Lynch did not apply for the position:

____YES X NO

(B) In giving as a reason that Ms. Lynch was not qualified for the position:

____YES X NO

(C) In giving as a reason that Ms. Cronin was expecting to hire Ms. Lynch for a different position?

X YES ____NO

(2) Kelley Cronin:

(A) In giving as a reason that Ms. Lynch did not apply for the position:

X YES ____NO

(B) In giving as a reason that Ms. Lynch was not qualified for the position:

____YES X NO

(C) In giving as a reason that Ms. Cronin was expecting to hire Ms. Lynch for a different position?

X YES ____NO

(3) Ann Maguire:

(A) In giving as a reason that Ms. Lynch did not apply for the position:

 \_\_\_\_YES <u>X</u> NO

(B) In giving as a reason that Ms. Lynch was not qualified for the position:

 \_\_\_\_YES <u>X</u> NO

(C) In giving as a reason that Ms. Cronin was expecting to hire Ms. Lynch for a different position?

 \_\_\_\_YES <u>X</u> NO

(D) In giving as a reason that Ms. Maguire did not have hiring authority?

 \_\_\_\_YES <u>X</u> NO

7. Did Ms. Cronin act with a state of mind described in one or more of parts (a)—(c):

(a) With the purpose of interfering with

(1) an advantageous contractual relationship of plaintiff with the City of Boston?

 \_\_\_\_YES <u>X</u> NO

(2) an advantageous non-contractual relationship of plaintiff with the City of Boston?

 <u>X</u> YES \_\_\_\_NO

(b) With awareness that her act would interfere with

(1) an advantageous contractual relationship of plaintiff with the City of Boston?

 \_\_\_\_YES <u>X</u> NO

(2) an advantageous non-contractual relationship of plaintiff with the City of Boston?

 <u>X</u> YES \_\_\_\_NO

(c) With awareness that her act would interfere with and willfully with respect to that interference

(1) an advantageous contractual relationship of plaintiff with the City of Boston?

 \_\_\_\_YES <u>X</u> NO

(2) an advantageous non-contractual relationship of plaintiff with the City of Boston?

 <u>X</u> YES \_\_\_\_NO

8. Did Ms. Maguire act with a state of mind described in one or more of parts (a)—(c):

(a) With the purpose of interfering with

(1) an advantageous contractual relationship of plaintiff with the City of Boston?

 \_\_\_\_YES <u>X</u> NO

(2) an advantageous non-contractual relationship of plaintiff with the City of Boston?

 \_\_\_\_YES <u>X</u> NO

(b) With awareness that her act would interfere with

(1) an advantageous contractual relationship of plaintiff with the City of Boston?

 \_\_\_\_YES <u>X</u> NO

(2) an advantageous non-contractual relationship of plaintiff with the City of Boston?

 \_\_\_\_YES <u>X</u> NO

(c) With awareness that her act would interfere with and willfully with respect to that interference

(1) an advantageous contractual relationship of plaintiff with the City of Boston?

 \_\_\_\_YES <u>X</u> NO

(2) an advantageous non-contractual relationship of plaintiff with the City of Boston?

 \_\_\_\_YES <u>X</u> NO

## III. Causation and Damages

1. What is the total amount of back pay, if any, that Helen Lynch lost between May 11, 1994 and today, as a result of not having been hired for the new Staff Assistant II position? Answer in DOLLARS or NONE.

 $ <u> 0 </u>

2. What is the total value, if any, of health insurance benefits that Helen Lynch lost between May 11, 1994 and today, as a

result of not having been hired for the new position? Answer in DOLLARS or NONE.

$ _____ 0 _____

3. What is the total amount of interest, if any, you find will be needed to fairly compensate Helen Lynch for loss of the use of any back pay and health insurance benefits from May 11, 1994 to today? Answer in DOLLARS or NONE.

For loss of use of back pay $ _____ 0 _____

For loss of use of health
 insurance benefits $ _____ 0 _____

4. What is the present value of the total amount, if any, of future earning capacity Helen Lynch lost as a result of her not having been hired for the new position? Answer in DOLLARS or NONE.

$ _____ 0 _____

5. What is the present value of the total amount, if any, of future salary Helen Lynch lost as a result of not having been hired for the new position? Answer in DOLLARS or NONE.

$ _____ 0 _____

6. What is the present value of the total future health insurance, if any, Helen Lynch lost as a result of not having been hired for the new position? Answer in DOLLARS or NONE.

$ _____ 0 _____

7. What is the present value of the total amount of pension benefits, if any, that Helen Lynch lost as a result of not having been hired for the new position? Answer in DOLLARS or NONE.

$ _____ 0 _____

8. What amount, if any, do you find to be required to compensate Helen Lynch fairly and reasonably for injury to her reputation resulting from any of the following that you find to be proved by a preponderance of the evidence? Answer in DOLLARS or NONE.

(a) Because others learned about the termination and nonrenewal of her business relationship, if any, with the City of Boston, and thought less of her

$ _____ 24,000 _____

(b) Because others learned about her not being hired for the new Staff Assistant II position, and thought less of her

$ _____ 0 _____

(c) Because others learned about her removal from the Hunger Commission, and thought less of her

$ _____ 12,000 _____

**IN ANSWERING QUESTION 9, YOU MUST ELIMINATE ANY DUPLICATION OR OVERLAP OF DAMAGES AMOUNTS YOU HAVE FOUND IN ANSWERING QUESTIONS 1–7 AND 8(a)-(c).**

9. What is the net sum of the amounts you have awarded, after deducting any amount that is duplicative in the sense that it is for the same harm or loss for which you made another award in answering Questions 1–7, 8(a), 8(b), and 8(c)?

(1) Total of 1–7, 8(a), 8(b), and 8(c): $ _36,000_ total

(2) $ _0_ was duplicative

(3) $ _36,000_ net

10. What amount, if any, do you find to be required to compensate Helen Lynch fairly and reasonably for emotional distress you find she suffered because of any of the following? Answer in DOLLARS or NONE.

(a) Because Ms. Cronin instructed Ms. Lynch to "clear out her desk"?

$ _____ 4,000 _____

(b) Because defendants decided not to consider Ms. Lynch as a potential candidate for the new Staff Assistant II position?

$ _____ 0 _____

(c) Because the defendants decided not to hire Ms. Lynch for the new Staff Assistant II position?

$ _____ 0 _____

11. What is the net sum of the amounts you have awarded, after deducting any amount that is duplicative in the sense that it is for the same harm or loss for which you made another award in answering Questions 10(a)-(c)?

(1) Total of 10(a)–(c): $ _4,000_ total

(2) $ _0_ was duplicative

(3) $ _4,000_ net

12. Do you find that the City of Boston, through one or more of its agents acting in

the scope of employment, acted with such willful or reckless disregard of the rights of Helen Lynch under the whistleblower law that you, in the exercise of your discretion, award triple the amount you found in answering any of Questions 1–7, 8(a), 8(b), and 8(c)?

_____ YES _X_ NO

If YES, what is the amount you find should be tripled?

$ _____

10/1/97 _____ /s/ _____
Date Foreperson

13(a). Do you find that Kelley Cronin acted with the state of mind of being willful or acted with the state of mind of being callous (that is, having reckless disregard) as to the rights of expression of Helen Lynch so as to warrant punitive damages, and, if so, do you in your exercise of discretion award punitive damages?

_____ NO
_____ YES, willful
___X___ YES, callous (or with reckless disregard)

**IF YOU ANSWER ANY PART OF 13(a) YES, GO TO 13(b). OTHERWISE SKIP 13(b).**

13(b). What amount, if any, of punitive damages do you award against Kelley Cronin, and on what state of mind? Answer in DOLLARS or NONE.

(1) willful $ NONE
(2) callous (or with reckless disregard) $ 10,000

(3) What is the net sum of the amounts you have awarded, after deducting any amount that is duplicative in the sense that it is for conduct with the same state of mind for which you made another award in answering Questions 13(b)(1)-(2)?

(a) Total of 13(b)(1)-(2): $ 10,000 total
(b) $ 0 was duplicative
(c) $ 10,000 net

10/6/97 _____ /s/ _____
Date Foreperson

On the foregoing rulings of law and findings of fact, it is ORDERED AND ADJUDGED:

(1) Judgment for plaintiff Helen Lynch against defendant Kelley Cronin for compensatory damages in the amount of $4,846 (consisting of $4,000 as found by the jury, together with prejudgment interest of $846 calculated at the Massachusetts statutory rate of 12% per annum from January 12, 1996, the date of commencement of this civil action to October 16, 1997, the date Final Judgment was first entered), based on Count V and the jury's finding of $4,000 in answer to Question 10(a) of Part III of the Phase One Verdict Form for emotional distress because Ms. Cronin instructed Ms. Lynch to clear out her desk;

(2) Judgment for defendant Kelley Cronin on Count I based on the court's rulings with regard to qualified immunity;

(3) Judgment for defendant Kelley Cronin on the verdict of the jury against plaintiff on Counts II, III, and IV;

(4) All claims of plaintiff against defendant John Greeley are dismissed;

(5) Judgment for defendant Ann Maguire against plaintiff;

(6) Judgment for defendant City of Boston against plaintiff;

All awards of damages bear post-judgment interest at the federal judgment rate of 5.94% per annum from October 16, 1997.

All parties are to bear their own costs.